THE INTERNATIONAL BUILDING AND LOAN ASSOCIATION, No. 2, v. WALL ET AL.

[No. 19,142. Filed November 28, 1899.]

BUILDING AND LOAN ASSOCIATIONS.—*Interest.—Usury.*—Contracts entered into between building and loan associations and members for interest in excess of the legal contract rate are not in their nature usurious, since the member stands in the dual relation of borrower and lender, and the transactions by reason of the mutuality of relationship and the contingent cost of the use of the money, are not mere loans of money as between strangers. *pp. 555, 559.*

SAME.—*Usury.—Presumption.*—Where defendant in an action against him to foreclose a building and loan association mortgage asserted under the plea of usury that the loan was not offered in open meeting, and that the by-laws were in conflict with the statutes of the State, the burden was on him to prove such claim, since the law presumes that the association exercised its granted powers according to law. *p. 556.*

SAME.—*Premiums.—Payment by Rate without Bidding.*—Contracts between building and loan associations and members for the payment of premiums by rate, without bidding, instead of in gross, are authorized by the act of 1897 (Acts 1897 p. 287), and said act legalizes all such contracts previously made. *pp. 556-559.*

SAME.—*Repayment of Loan.—Premiums.—Credits.*—Section 4450 Burns 1894 relative to the repayment of loans, entitling the borrower to "so much of the premium or discount paid by him on his loan for the priority thereof as shall bear the same proportion to the whole premium by him paid, which the unexpired time for which the loan was made bears to the whole time for which the loan was made" applies only to instances in which the premium has been determined in gross, and in which at the time of withdrawal the member has paid all or more than a proportional part of the premium. *p. 559.*

From the Jay Circuit Court.    *Reversed.*

*J. F. LaFollette, W. N. Harding* and *A. R. Hovey,* for appellant.

*Emerson E. McGriff,* for appellees.

BAKER, J.—Suit to foreclose a building and loan mortgage. Judgment for appellees. The error assigned is the overruling of appellant's motion for a new trial. The motion specifies that the decision is not sustained by sufficient evidence and is contrary to law.

Appellee James A. Wall, on December 31, 1893, was the owner of ten shares of stock of the face value of $100 each in appellant association, a corporation organized and doing business under the laws of this State. On that day he borrowed $1,000 of appellant and executed his bond to secure the payment of 75 cents per share monthly dues, and interest at 6 per cent. per annum upon $1,000 payable monthly and a premium of 6 per cent. per annum upon the face of the shares payable monthly. These payments were to be kept up until the stock should mature. At the same time he assigned his stock as collateral, and for further security executed the mortgage in suit, his wife and co-appellee Mary Wall joining therein. On June 22, 1897, appellee James made his last payment under the bond. His payments on stock then aggregated $292.50, on interest $215, and on premium $215. On August 2, 1897, he tendered appellant $660, and, after this suit was commenced, duly deposited that sum with the clerk for appellant's use. The question is, was the tender sufficient?

If this were considered to be a loan between strangers, and the plea of usury were interposed, it would be plain that appellee tendered more than enough to satisfy the debt. Appellee urges that the loan must be so treated because the building and loan statutes of this State contravene our constitutional provisions that prohibit the granting of special privileges and the passage of special laws relating to interest.

This has recently been decided adversely to appellee's contention. *Security Savings, etc., Assn.* v. *Elbert, ante,* 198.

There was no question between the parties but that appellee, at the time of the tender, was entitled to be credited for the $292.50 paid on stock and interest thereon to the amount of $32.85. But this sum, added to the tender, was not equal to the face of the loan—to say nothing of premium, interest, fines, and payments for insurance, claimed by appellant. To make the tender sufficient, it is necessary to credit appellee with at least a part of the premium as payment upon the principal of the loan.

It is said that the premium charged is unlawful because the evidence does not affirmatively show that the loan was offered in open meeting of the directors, conformably to §4449 Burns 1894, §3412 Horner 1897. There was no plea of *nul tiel* corporation. The due incorporation of appellant was therefore admitted. The presumption is that appellant exercised its granted powers according to law. The burden was upon appellee to prove, under his plea of usury, that the loan was not offered in open meeting. The same is true with reference to the claims based on the fact that the evidence is silent as to the by-laws, as to the absence of conflict between the by-laws and the statutes, and as to the loan being made in compliance with the by-laws.

But, it is claimed, the bond and mortgage show that the premium is illegal. They provide for a premium of 6 per cent. per annum upon the face of the shares payable monthly, that is, 50 cents per share per month, until the stock matures. The contention is that the taking of premium in this mode, instead of in gross, is outside the powers conferred upon appellant corporation by statute. §4449 Burns 1894, §3412 Horner 1897, provides: "The by-laws of the association shall prescribe the manner of awarding loans to its members, the time or times when the premium, if any, shall be paid, * * * or such association may provide in its by-laws that the loans shall be made to the members of the association who

shall bid the highest premiums for the preference or priority in procuring loans (the premium to be payable at one time or in instalments). * * * The premium shall be bid as of so much per share." It is apparent that the statute does not require the premium to be paid or deducted "at one time". But, must the offer be of "so much per share" as a gross premium for the indefinite time it takes the stock to mature? Or, may the offered premium be of "so much per share" for each year it takes the stock to mature? It may be said, on the one hand, that the statute does not explicitly authorize, and, on the other, that it does not expressly forbid the latter method. But it is a matter of general information that in 1893, before and since, this latter method was quite extensively adopted by associations organized and claiming to act under this statute. This suit was begun on September 24, 1897. On July 1, 1897, an act came into force, of which §9 provides: "It shall be competent and lawful for the borrower from such association to agree, in writing, upon a given rate of premium in addition to the interest to be paid upon each loan, without bidding. All contracts heretofore made between any borrower and any such association for the payment of any premiums, with or without bidding, are hereby legalized." Acts 1897 p. 287. Whether or not, prior to the taking effect of this act, an agreement for premium by rate instead of in gross was authorized by statute, is a question unnecessary to decide; for, no new rights having intervened, the legislature may ratify acts it might have authorized. *Schneck* v. *City of Jeffersonville*, 152 Ind. 204. As the legislature has power to authorize building and loan corporations to take premiums (*Security Loan, etc., Assn.* v. *Elbert, ante,* 198), it can permit its corporate creatures to exercise that power in any mode it sees fit. Whether the so-called premium be determined by rate or in gross, the thing in its essence is the same. In any event, it is a sum paid by the member in his character of borrower. And the so-called interest is a sum paid in the same character. It is but a

partial view to add the 6 per cent. interest ($5 a month) and the 6 per cent. premium ($5 a month) and say that the borrower is paying 12 per cent. per annum for his $1,000 loan. The $1,000 that he received was not, strictly speaking, a loan at all. Under the contract relations between the parties, it lacked a very essential element of a loan—the repayment of the principal by the borrower. "The contract between the parties was that appellee should pay stated sums monthly (1) for dues upon stock, (2) for interest on the loan, and (3) for premium for the loan, and that the association, in consideration of these payments, should never call upon appellee to repay the loan in lump, but that the mortgage should be released when the payments on stock, together with appellee's proportionate share of the association's profits from interest, premiums, and fines, should make the real value of the stock equal its face value." *Marion Trust Co.* v. *Trustees of Edwards Lodge, ante,* 96. A complete view requires that the member's character of investor be considered along with his character of borrower. Appellee was entitled to receive, and did receive, the $1,000 by virtue of his ownership of ten shares of the face value of $100 each. At that time the shares may not have been of the real value of $5 each. The so-called loan was a payment to appellee in anticipation of the matured value of his stock. The money received, whether called a loan, or an advancement, or a redemption, or what not, (being the face value of the shares), or the face value of the stock, either indiscriminately, is taken simply as the basis on which to determine the payments of the member in his dual relations of investor and borrower. In his character of borrower, the member does not repay a cent of the principal of the so-called loan. When his payments as investor, together with his share of the profits from the use of the capital of all the investors, equal the principal of the so-called loan, the principal is paid by the association's applying thereto the funds due the member in his character of investor. This duality

of relationship makes it impossible to tell in advance what the net cost of the use of the money, considered as a mere loan, will amount to. For example: This appellee paid $7.50 a month as investor and $10 a month as borrower; if the stock should mature in eighty months, he would have paid $600 as investor and would have received credit for $400 profits, and would have paid $800 as borrower, leaving $400 as the net cost of the use of $1,000 for eighty months, being 6 per cent. per annum for the time; if the stock should mature in less time, the net cost would of course be less; and it would take 133 1-3 months for him to pay in $1,000 as investor, leaving the 12 per cent. per annum undiminished by profits. This calculation is made as the account would stand at the maturity of the stock, eliminating credit for interest on monthly payments. If this were taken into the account, the net profit on the member's investment would be less. But the fact remains that the net cost of the use of the money would depend upon the amount of net profits to be offset against the apparent 12 per cent. per annum. It is the contingent cost of the use of the money and the mutuality of relationship that takes the transaction outside the domain of usury.

In support of the decision, appellee finally contends that he is entitled to credit for part of the premium, under §4450 Burns 1894, §3413 Horner 1897, which provides that a borrowing member may pay off his loan by paying the principal, less stock dues and interest thereon, "and less so much of the premium or discount paid by him on his loan for the priority thereof as shall bear the same proportion to the whole premium by him paid, which the unexpired time for which the loan was made bears to the whole time for which the loan was made." This, very obviously, applies only to instances in which the premium has been determined in gross and in which, at the time of withdrawal, the member has paid all or more than a proportional part of the premium.

Judgment reversed, with instructions to sustain the motion for a new trial.